You may call the case. Mr. Zumstein, you may approach the bench. You're welcome. May it please the court, Mr. Rathbun, my name is Bruce Zumstein and I do represent Cheryl Matthews in her capacity as the collector of the estate of her father, Gerald Alling. This is a very interesting case. I'm sure you hear it each time and every couple of minutes, but I think it's interesting because the chance to set some precedent in a matter that is really an evolving matter. Two things are going on in society right now that are pertinent to this case. And those two things are we're getting older and living longer. And we're also breaking up the nuclear family. We're seeing fewer nuclear families staying together. And we see people living longer. And as we age, we tend to not be quite as able to take care of ourselves as we used to. And I think that those two factors are what contribute to this case coming before the court. I do a lot of probate work. And everyone always says probate law is such an old-stained field of law. But I think it's a very interesting area. It's evolving greatly. There's a lot going on right now in this field. And I think it's because of the two factors I just cited. And it's demonstrated in a very specific way right now. Since we filed the appellate briefs, there's been several things going on which are of precedential interest. I filed a motion in the court for leave to cite additional authority. And I did cite the Supreme Court decision in your DeHart case that this panel or this court decided and it was taken up by the Supreme Court and was ruled on by the Supreme Court since we filed our appellate briefs. That is a very recent, significant appellate court decision. Most people look at it because of the doctrine of equitable adoption that's going on right now. But if you read that case, it's very pertinent to our activity as well too because it does address the question of whether a spouse can be found engaging in undue influence. And that case is very clear that it says that a spouse, in the right circumstances, can be found to have engaged in undue influence to such an extent that property can be called back into an estate. And there's no question following the DeHart decision that a spouse can be a fiduciary and be found to have engaged in undue influence. Another recent case that came in since the briefs were filed came in even after the date where I filed a motion to add the additional authority, which was the Supreme Court decision of the DeHart case. And I didn't get a chance to file a motion to do so, but I'd like to move verbally to ask the court to recognize that there is another case that is of precedential interest in this matter, and that came out of the 4th District. I'd like to cite to the court the case of the estate of Stalling, S-T-A-H-L-I-N-G. Stalling is 2013 Illap 4th out of the 4th District, 2013 Illap 4th, 120271. It's not cited in any of the briefs, but I don't think that Mr. Rathbun would be opposed to my citing it because it's strongly in his favor. I think he's got it in his hand, ma'am, there, reading his body language. I don't think he would object with it. And the reason the Stalling case is pertinent, I would say, is that that involved an agent acting under a power of attorney where the agent benefited from transactions with the principal, but the agent only had a power of attorney for health care, did not have a power of attorney for property. So in that instance, it's like the Alling case. In the Alling case, Gerald Alling gave his wife a power of attorney for health care, but did not sign any power of attorney for property. In my brief, I argued that that may create a fiduciary relationship with a matter of law, and the Stalling case, which I disagree with, by the way, which I'll get to in a moment, made a specific finding that a power of attorney for health care does not raise a presumption of undue influence, unlike a power of attorney for property. So as a matter of law, a power of attorney for health care does not raise the presumption of an undue influence. Do I agree with that? No, I don't, and that is a Fourth District case ruling. So you are somewhat free to review this matter yourself. I don't think that it's correct, because I will ask you, what do you think when someone holds a power of attorney for health care? They tend to have more involvement with the principal than, I think, a power of attorney for property. Those are somewhat incidental matters, but if you're sick, the agent acting under a power of attorney for health care has constant involvement with their principal. And also, making as crass as I can, who has more influence over you? Someone who's writing checks for you, or someone who can decide what life support to stay under? I'm not sure that the finding in Stalling is correct. It certainly is a decision by that court, and it does find that, as a matter of law, there is no presumption of undue influence from that power of attorney itself. And if that court, if that decision is given precedential benefit by this court, about a page and a half of my brief should be stricken, if I do argue that there may be situations where the agent acting under a power of attorney is presumed, as a matter of law, to be a fiduciary. But if you read the brief that I filed in this court, my argument really was more that the circumstances and facts in this case create the fiduciary relationship as a matter of fact, not as a matter of law, but as a matter of fact. And we do cite many cases in the brief that indicate that when the agent or the party benefited, in this case the donee, you can have a beneficiary under will or under a trust or a donee under a gift, and a lot of the case law is identically the same. But where you have a donee of a gift, I would say, who has the kind of involvement with the life of the donor, as Charlene Alling had with Gerald Alling, you can create a fiduciary relationship. And if there is a fiduciary relationship, then that means that that party who holds that special relationship, that confidential relationship, cannot undertake activities or do things that benefit the donee. And our testimony in the trial that we had, I believe, established in a clear and convincing manner that Charlene was a fiduciary and that she did benefit from transactions in which she participated. I asked this court to find that it was wrong for the trial court to grant the motion for directed verdict. I believe we established a prima facie case by clear and convincing evidence and that this matter ought to be sent back again for other proceedings. I go back to the DeHart case, which I think is a very interesting case and a very new case again, too. And in the DeHart case, they do talk about the Glo-Vo-Sek case, which I'll pronounce right one of these times, Glo-Vo-Sek case, and that's the one where the appellate court judge opined that he believed the day would come when there would never be a transaction between a husband and wife that could ever be the basis for undue influence because of the special relationship between husband and wives. Well, DeHart didn't overrule that case, but DeHart did comment quite generously that there can be circumstances where there are transactions between a husband and a wife, where those transactions can be an expression of undue influence and ought to be brought back. It mentions the usual standard, which is applicable mostly in will contest cases, but it does affect gifts as well, which is the four-pronged test. There's got to be a fiduciary relationship between the donor and the person who receives the gift. The donor has to be dependent and the beneficiary the dominant person. The donor has to give trust and confidence to the beneficiary, and the gift has to be prepared or its preparation procured by the donee. I believe we showed all of those elements in our case. We met the test. We showed by clear and convincing evidence sufficient evidence to establish a prima facie case. The reason I mentioned DeHart again, besides it does cite the four-pronged test, is that one of the prongs they said is clearly different from the analysis performed by the court in the Glogovitz case. And the element they talked about was that the first prong is that the presumption requires a fiduciary relationship between the donor and the donee who receives a substantial gift compared to other persons who have an equal claim to the testator's or the donor's bounty. And I kept overlooking that myself, and I realized only after I saw the DeHart case why that is an important element. What that says is that if there is a gift, yes, you can make the gift, but who are you making the gift to and what are the circumstances behind it? And in the Glogovitz case, it was a gift from the husband to the wife, as in many cases are, and the persons who claim that the gift ought to be called back to the estate were nieces and nephews, somewhat distant relatives. There's no showing that they were close or something of that nature. But what the DeHart case emphasized in their decision was that in the case in DeHart, it was the son, arguably a son through equitable adoption. They say for purposes of argument, he's a son, at least for purposes of pleading. You have a son who is totally, completely excluded, and the son, by laws of intestacy, has the same right to receive property from the testator or the donor that the spouse did. And it indicated that because the children have an equal claim to this bounty, they will look at the nature of the gift with an even more stringent standard. How did the spouse come to receive the property rather than some of it going to the children? We're not challenging the marriage of Charlene Alling and Gerald Alling, even though it was done one day before visiting the banks and eight days before the deed and 28 days before he died. Well, it was a while before she found out she was divorced initially, wasn't it? She thought she was married for a long time. There's no question about it. She certainly acted like a woman scorned as soon as she found out. And I think part of that emotion is what got to Judge Gomorrah. But there's no question it was a short marriage in fact rather than in law, rather than in fact, perhaps. But nonetheless, what the DeHart case emphasized was that who are the persons who are harmed by this gift, which may be the product of undue influence? Now, the trial judge in this case made certain findings with regard to the history of the family's interactions, saying that the family wasn't very close, right? Well, she did, but we also presented evidence that said the reason they weren't close is that the spouse was actively participating in excluding them. And that's one of the tests that is in here. You know what? What Charlene never had to show was any rebuttal of the presumption we raised, which is did the donor make a frank disclosure of the transfer? None of the children ever found out. No one found out. There certainly was no payment of adequate consideration. And the existence of competent and independent advice. Of course, the donor is the one who signed all these documents. Well, if he hadn't signed, it wouldn't be accomplished. The question is was the influence used in order to compel them to do so. Was that of his own volition? And we have no testimony of anyone other than the wife with regard to the nature of those gifts. And the usual transaction or analysis made is if there is a presumption of undue influence, which I believe has been raised through the many facts alleged in here, if that is true, well, that doesn't mean the gift is bad. It just means that the donee has to show that there was some rebuttal to it. And the rebuttal is normally to say is there a disclosure? Is there consideration? And is there competent and independent advice? Now, Gerald controlled his own finances, correct? Up until the creation of the joint tenancy. We did have some evidence in there that she had written checks or she had written checks that he signed. So she participated in the thing, but she didn't have power to sign checks until she came on as a joint tenant. And, in fact, she never had power to sign checks from the first marriage in 1980 through practically the date of this fellow's surgery. By the way, what do you think the standard review is? Because the judge made certain findings. They said considering all the evidence, so is the standard manifest weight? I do not believe so, but I will be glad to stand corrected. But I think I met the manifest weight standard as well. I read Judge Gamora's ruling, and she goes on for 10 pages, I think. She never really says. And the order doesn't indicate. I believe that this is. There was a statement that she was considering all the evidence, right? I know she said she heard all of the evidence. I know she said she ruled based on all the evidence. She said she heard all of the evidence. To me, her ruling is based on two factors. One, she says there was no showing of undue influence. And, secondly, when Gerald gave her the gift, she deserved it. I can't tell you what her real standard was. I mentioned in my brief that I believe that it is the matter of law and not manifest weight. Mr. Rathbun cites both of them and doesn't come down to a conclusion and say which one it is. He's kind of flipping a coin, whereas I come down and decide that I don't think it's manifest weight. But even if it's manifest weight, the evidence shown in this case was so strong, I think that this would have been contrary to manifest weight if I had to go to that extent. I don't think I did, but the facts of this case are extraordinary for showing that a gentleman who had a house and $100,000 in the bank in his name alone, and he had it on his name and his name for two or three decades, in the space of 28 days before he dies, put something in a joint tenancy. Mr. Rathbun, I'm sure, is going to argue that because he saw the light, he decided to do something good. Well, by and large, they were together for 23 years, weren't they? Yes, they were. Off and on, they were together for 23 years. And during the 23 years, he never put her name on the bank account and he never put her name on the deed of the house. He didn't do that until after she found out about the secret divorce. And after he was diagnosed with bone cancer and in the hospital practically every single day from the day of the diagnosis until the day he died. I looked at the time chart and it looked to me as though over the space from February to June, he was out of the hospital, out of hospice care, no more than a month. And, gee, look at that list of medication he's taking, too. Two minutes. I ask the court to reverse the decision by the trial court, send it back for further proceedings. And I think the briefs are well written and we can rely on them. And, once again, evolving law is going on right now and probate as we speak. Thank you. I'm sorry. You may approach. Thank you, Your Honor. Also present is Dan Mirren who had an appearance in the trial court and helped with the brief in this case. Are you excited about the developing law in this area? Actually, to my friend who I've known for almost 35 years, I have to say I would ask you to decline his invitation to set precedent and instead do what I respectfully suggest this and all courts should do, which is to follow precedent. And I think that the precedent is pretty clear out here. I've seen how my opponent tries to make Glagelstek act like it doesn't appear, but our Supreme Court specifically followed Glagelstek. And the only point that you notice in Glagelstek, he didn't say there never can be a case. He said it's possible, but it's really, really, really unlikely you're going to have a case where you're going to have undue influence by a spouse because spouses influence their other spouse every single day. If it's ever going to happen, isn't it going to happen in a case where the husband has actually divorced the wife and didn't tell her about it? I mean, that suggests that this marriage was not exactly a two-way street of bliss. And I agree with Your Honor in that. In fact, that's one of the important things we take into deciding who, if there is, if we're hunting to see if there's this presumption of undue influence, who was the dependent person and who was the dominant person? Who was the one who kept all his money to himself, didn't even tell his brother what he was going to do? Who was the one who doesn't even tell his wife he's divorcing her? She comes back even thinking that she's married because he persuaded her to come back. Who's the one who's dominating this relationship? So I would suggest very strongly, yes, Your Honor, in this case, this is not Ozzie and Harriet. And this fellow quite probably had one guilty conscience as he's getting ready to see his maker, and I don't think he acted just like a person would do who is expressing what I think is the key issue here, which is donative intent. Because that's what we're trying to do is we're trying to decide, did Charlene take over his intent and substitute hers for it? Here's a man who's been for almost 23 years, they're living as husband and wife, sometimes formally, sometimes not, living as husband and wife. A son who testified he didn't expect anything from his father's estate. And a daughter who spent in the 20 years one holiday together. Who would be more likely to be the recipient of what he has? My opponent is suggesting that we should find a fiduciary relationship here because she took care of him when he was dying at the end of his life. I think that's an interesting policy what he's suggesting is that if you take care of a sick spouse, you're going to run the risk of not being able to get anything that spouse gives you because you will be presumed to have somehow taken advantage of that. If you look in this case, it's very interesting. The Glogozbek case had brought out a fact, which we pointed out in our brief. What did Charlene do? There's no indication she told anybody what to do. No indication that she overcame his will. The one thing she did was she drove him to the bank and she delivered the deed to the quick claim deed. And Glogozbek said basically that you don't create undue influence by acting as a chauffeur. Nobody at the bank said she did anything wrong. Nobody at the hospital when she signed the deed said she did anything wrong. I would suggest to you that there is not a fiduciary duty in this case. This is the issue about the undue influence. We do have some testimony that he wasn't feeling guilty on the 20th of May. This attorney, Michele Roth, testified that he told her he wanted to leave his property to his children. But on the next day, Charlene has a quick claim deed that he signs that she has had prepared. So isn't that where he just had this change of heart in that 20-hour period or 15-hour period? Because on the 20th of May, he says, I want my property to go to my children. Interesting. If he said he wanted his property to go to his children, he had an attorney there. He could have had a will drawn up or even a deed or any other document. For reasons that are kind of bizarre, the lawyer just walks out and leaves, never writes a will, never does anything. But he didn't take any steps. And I think even more telling, if she's influencing him adversely, there's no evidence whatsoever that Charlene interfered with his preparing a will that he privately could have dictated and dealt with Michele Roth. He could have told her that. She wouldn't be a participant in it, and it would have happened. I think the absence of it happening is a better conclusion. Why he said that, I don't know why he said that. I don't know. I can imagine. I'm not a parent, but I can imagine the horror for a parent to say, I don't want anything to go to my children. It's human nature. And I think we can't, in the courtroom, ignore human nature in this case. If you look at the cases where they presume undue influence, almost every one of them are outside the context of the marital relationship. My opponent says he's cited a lot of cases regarding the presumption. Almost all of those cases don't involve a husband and a spouse. Gagesbeck and Meech, cases where they point out, how is there not going to be some influence in there? What is it? They didn't do anything wrong in this case. I think that in Meech, they didn't apply a presumption of undue influence because it was a husband and wife case. I think you don't even get to the point of finding that. Because in this case, I don't think they have, first of all, established a fiduciary relationship. Just because she took care of her husband when he's dying, I don't think, and there would be cases cited, if that was what was necessary to create it, and we don't see any cases cited by the appellant, that there was a fiduciary relationship. You asked a question of Mr. Zumstein regarding the manifest weight standard. And there are two things. First of all, to determine whether there's a fiduciary duty exists is a question of law. However, it can only be applied to facts that the court would find. Because this was a motion for a finding at the conclusion of the plaintiff's case, the judge was allowed to and did, in fact, weigh the evidence. And obviously, in this case, she didn't find a fiduciary duty in this. And her findings regarding the facts of what they were, I think those are a manifest weight standard. So if I look like I'm walking on a fence, that's because the law doesn't sit there and spell it out to you directly. But it is a case where I think you have to find that they have not proven, by clear and convincing evidence, that the will of Gerald Dowling was overcome by Charlene. And there never was a presumption in their favor. In fact, the exact opposite presumption exists when you're dealing with a husband and wife. The law presumes that a CD is donating your money to the person you want it to. And in this case, there's no showing other than this somewhat bizarre family relationship. The daughter sees him once in 20 years on a holiday, begins keeping a ledger or a log, as soon as she finds her father has cancer, decides to go out and get a copy of the divorce decree, never tells Charlene, and would Charlene be upset with her stepdaughter who hid the fact that her father had divorced her? I would be horrified to have a client who wouldn't be upset under those circumstances. I'd also be horrified to think that we should do anything to set aside probably one of the only things that Gerald Dowling did right, which was to take care of his spouse after he died, instead of two children who didn't pay attention to him while he was alive. Thank you. Any questions? You may. Thank you. Mr. Rathbun says that Charlene was taking care of a sick spouse and that Charlene was a chauffeur. Noah, if you've got a sick husband at home, you give him chicken noodle soup, you give him a warm blanket, you help take him to the doctors? What was Charlene doing? Charlene was renting a wheelchair. She was driving him to the bank with a wheelchair so he could change bank accounts. She's calling the recorder of deeds, asking for a deed form. She has Gerald sign this deed in the hospital. Two days later, which is on a Monday after he signs it on a Saturday night, she goes to the recorder of deeds and says, record this instrument, and the recorder of deeds says, you don't have a legal description. They track down an old deed. They attach it there. She's sticking that deed in front of the recorder of deeds with the correct legal description on there. That is not the activities of someone who is a chauffeur and just taking care of a sick spouse. Those are the activities of someone who is willfully undertaking activities for her own personal benefit to the exclusion of the children of the decedent. She may have thought she earned it because of what she was doing, but then you file a claim for services. There's a provision for taking care of that one. I emphasize again that what she did is she went to the bank. She went to the courthouse. She talked to three lawyers in the space of a week and a half. One lawyer came to the home who was able to testify because they were Gerald's lawyer, to indicate that Gerald wanted his property to go to his children. Why did Michel Rowe prepare the will that day? You may remember that Gerald went to the hospital within hours of that visit with Michel Rowe. He was a very sick man. Are you going to, as an attorney, meet someone at their house, prepare a deed, prepare a will? She said, I'm not going to prepare a deed. She said, I'm not going to prepare a will. He was a sick fellow. He never really went anywhere to the hospital in hospice care since that day of the visit. These are not the activities of a loving spouse. I don't deny that she was a loving spouse. But I believe her activities were more consistent with a beneficiary trying to secure benefits while acting in a fiduciary manner. And it raises a presumption, which is all I'm saying. Charlene will have her day in court to show whether this was a transaction for which she can overcome the presumption of undue influence. We're only talking presumptions here. And the trial court judge made a mistake ruling that we did not raise the presumption requiring the spouse to present evidence. Charlene has not presented any evidence in her case in chief whatsoever trying to show that this was a transaction that was Gerald's intent, not hers. Thank you. I have a question about the marriage, and I'm looking at page 8 of your brief. You talk about how on May 13th she drove the decedent to the Wilk County clerk. Is the clerk's office located somewhere other than the courthouse? Yes, about three blocks away in Joliet. The county building where you get the marriage license is in the county clerk's office, which is about 302 North Chicago Street. And the courthouse is 0 Chicago Street. It's about three blocks away. Back in the day, I used to do a lot of weddings, and there was always a one-day waiting period. Was there a waiver? I don't know. I was concerned about that as well, too, but I saw no evidence that I could present. We were not there. We know a license was issued. We know that the marriage was performed. And I believe it was the same day. And nobody is challenging whether the marriage is valid. And the only transaction that's being challenged is whether the creation of joint tenancy was the result of undue influence. So why are we required to assume that they were properly married? Well, we don't have to. We could challenge the validity of the marriage, but we did not do so. There's no evidence presented in that matter. Because the precedent is that if you're husband and wife, you can't unduly influence the other. I don't think that's the law. I think the law is more in the DeHart case that says that a spouse can unduly influence a husband. All right. All right. Okay. Thank you. In the right circumstance, as a matter of fact, not as a matter of law. Thank you. Thank you. We will be taking the matter under advisement and exuberantly discussing the development of the law in this area and render a decision, hopefully without undue delay. We'll be in recess for a panel change.